UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,                 :

           v.                                :     **MEMORANDUM AND ORDER**
                                                :     23-CR-500 (WFK)

ORLANDO MCKENZIE,                         :

                  Defendant.        :
--------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On May 15, 2025, Orlando McKenzie ("Defendant") pled guilty to one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(2). Plea Agreement (the "Plea") ¶ 1, ECF No. 58; Indictment ¶ 2, ECF No. 1.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to 188 months' incarceration; five (5) years of supervised release with both the standard and special conditions of supervision; mandatory restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the forthcoming Order of Forfeiture; and a $100.00 mandatory special assessment.

## I.    Background

### A.    Factual Background

"From August 2023 to November 2023, [Defendant] trafficked adult and minor victims to work in prostitution at an open-air sex trafficking market" in various locations, but most prominently "along a stretch of Pennsylvania Avenue in Brooklyn, New York" (the "Penn Track"). Presentence Investigation Report (the "PSR") ¶ 4, ECF No. 60. Defendant's activities and victims—including Jane Doe #1 and Jane Doe #2—were unearthed by an investigation conducted by the Federal Bureau of Investigation (the "FBI"), the New York City Police Department (the "NYPD"), and other law enforcement agencies "beg[inning] in late November 2023[.]" *Id.* ¶ 3.

---

[1] Citations are to the docket in *United States v. McKenzie,* 23-CR-500. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

Investigators obtained evidence which included "text messages, prostitution advertisements, videos and financial records, reflect[ing] that [Defendant] had multiple women working in prostitution for him, and used violence and threats of violence against more than one woman." *Id.* ¶ 7. For example, one video from August 2023 depicted Defendant encouraging another woman to strike and beat Jane Doe #2 on a sidewalk. *See id.*

Defendant required his adult victims, including Jane Doe #1, "to solicit customers on the Penn Track, and to engage in commercial sex acts with customers in cars or in nearby hotels." *Id.* ¶ 4. "[A]fter [Jane Doe #1] engaged in commercial sex acts[,]" Defendant "collected the proceeds . . . and regularly threatened her to obtain additional money." *Id.*

"On November 26, 2023, Jane Doe #1 called 911 from a storage locker located in the vicinity of the Penn Track to report that [Defendant] was threatening to harm her 2-year-old son if she did not give [him] money which she earned[]" by way of prostitution.[2] *Id.* ¶ 5. Law enforcement officers responded by "execut[ing] a search warrant of an apartment where [Defendant] was staying with Jane Doe #1 and others in Yonkers, New York[.]" *Id.* Upon arrival, the officers found "Jane Doe #1's minor son, a 17-year-old pregnant minor"—later identified as Jane Doe #2 "who had previously been reported missing"—"and two other adult females[.]" *Id.* Law enforcement subsequently returned Jane Doe #2 to the Administration for Children's Services (the "ACS") "facility from which she ran away." *Id.* Defendant was not located at the apartment at the time the search warrant was executed. *See id.* ¶ 5. Jane Doe #2

---

[2] "[Defendant] denies . . . Jane Doe #1's claim that he threatened to harm her son." Def's Sent'g Mem. at 3, ECF No. 67. The Government disagrees, stating "the fact that law enforcement recovered Jane Doe #1's son from the apartment where [Defendant] was staying shortly after Jane Doe #1 called 911, established by a preponderance of the evidence that [he] was threatening to harm Jane Doe #1's minor son." Add. to PSR at 3, ECF No. 70 (citing Gov't Sent'g Mem. at 2 n.1, ECF No. 69). The U.S. Probation office declined to amend this characterization "[b]ased on the evidence provided by the Government[.]" *Id.*

ran away again from the ACS facility at some unspecified time before December 6, 2023. *See id.* ¶¶ 5–6.

On December 6, 2023, Defendant and Jane Doe #2 were discovered at a motel in Connecticut after "an officer acting in an undercover capacity responded to an online advertisement for prostitution that featured Jane Doe #2[.]" *Id.* ¶ 6. In fact, "[t]he investigation . . . revealed several . . . online advertisements for prostitution featuring Jane Doe #2[.]" *Id.* ¶ 8. At the time of Defendant's arrest at the motel, "[he] told law enforcement officers that Jane Doe #2 was the mother of his unborn child." *Id.* ¶ 6.

### B. Procedural History

#### 1. *Indictment, Bond Decision, and Trial Schedule*

On December 5, 2023, a U.S. Grand Jury returned a three-count indictment against Defendant, charging him with the following: Count One alleged sex trafficking, in violation of 18 U.S.C. § 1591(a)(1)-(2) and (b)(1); Count Two alleged sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1)-(2), (b)(2), and (c); and Count Three alleged promotion of prostitution, in violation of 18 U.S.C. § 1952(a)(3)(A). *See* Indictment ¶¶ 1–3. The indictment also alleged criminal forfeiture as to all counts. *See id.* ¶¶ 4–7.

On December 6, 2023, "[Defendant] was arrested in New Haven, Connecticut, by agents" from both the FBI and a task force "working with the FBI." PSR ¶ 9. On December 7, 2023, Magistrate Judge James R. Cho arraigned Defendant on the indictment. ECF No. 4. Defendant entered a plea of not guilty to all counts. *Id.* Magistrate Judge Cho denied Defendant's proposed bail package and ordered him detained pending trial. ECF Nos. 4, 7.

On March 22, 2024, defense counsel filed a motion appealing Magistrate Judge Cho's bond decision, requesting a bond hearing, and submitting a renewed bail package. ECF No. 23.

On May 17, 2024, this Court held a status conference, during which it heard argument on Defendant's bond motion and reserved decision on the motion. On May 22, 2024, the Court issued a decision and order denying Defendant's bond motion. ECF No. 33.

On November 14, 2024, the Court held a status conference, during which it scheduled a jury trial to commence on July 28, 2025. On November 20, 2024, the parties filed a joint proposed schedule for pretrial submissions. ECF No. 38. The Court granted the proposed pretrial schedule the next day. ECF No. 39. On February 24, 2025, the Court granted defense counsel's motion to adjourn the trial to January 20, 2026. ECF Nos. 48–50.

### 2. *Change-of-Plea Hearing and Agreement*

On May 6, 2025, defense counsel submitted a joint letter requesting a change-of-plea hearing. ECF No. 53. The next day, this Court scheduled the hearing for July 2, 2025, which was rescheduled to May 15, 2025. ECF Nos. 54, 56.

On May 15, 2025, this Court held the above-mentioned change-of-plea hearing, during which Defendant pled guilty to Count Two of the indictment pursuant to a written plea agreement. *See* Plea ¶ 1; *see also* Indictment ¶ 2. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 262 months' incarceration or below. *See* Plea ¶ 4. With respect to the applicable range under the U.S. Sentencing Guidelines (the "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Government also agreed "it [would] not oppose [Defendant]'s request that a sentencing range of 151 to 188 months' imprisonment is appropriate." *Id.* ¶ 5(b). The Government further agreed "no further criminal charges [would] be brought against [Defendant] for" the criminal activity catalogued in all three counts of the indictment. *Id.* ¶ 5(a). Additionally, the Government agreed "to dismiss the remaining counts of the Indictment with prejudice" at the time of sentencing. *Id.*

4

In the Plea, the parties further agreed to criminal forfeiture. *See id.* ¶ 1(g). "However, [Defendant] state[d] there are no monies and/or properties owned by him or in which he may have an interest that are subject to forfeiture in this case." *Id.* ¶ 6. Failure to "disclose all assets and/or inform the government in writing of any material changes related to his ownership or interest in any assets up until the time of sentencing" may result in "additional criminal charges against [Defendant]." *Id.* ¶ 7.

Furthermore, the parties agreed to mandatory restitution "in the full amount of each victim's losses as determined by the Court[.]" *Id.* ¶ 1(e). Specifically, "[Defendant] agree[d] and stipulate[d] that for the purposes of restitution pursuant to 18 U.S.C. §§ 1592, 3663A and 3664, both Jane Does #1 and 2 [would] be entitled to claim restitution." *Id.* ¶ 1(e) n.1.

The parties also stipulated to Defendant's potential removal from this country "if [he] is not a citizen of the United States[,]" and the requirement "under the Sex Offender Registration and Notification Act, a federal law," for Defendant to "register and keep the registration current in each of the . . . jurisdictions" outlined in the Plea. *Id.* ¶¶ 8, 10.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's

5

statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III.  Analysis

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

#### 1.         *Family and Personal Background*

Defendant was born on July 2, 1984, in Portmore, Jamaica, to the marital union of his father, Trevor McKenzie, and his mother, Delores Riley. *See* PSR ¶ 40. Until he was five years of age, Defendant's mother raised him "in a low-income household in Jamaica" before "[she] immigrated to the United States" without Defendant. *Id.* ¶ 42. "[Defendant]'s maternal aunt continued to raise [him] until he was age 6, when he began living with his maternal grandparents." *Id.* Defendant immigrated to the United States at seven years of age and he

6

"resided with his mother and siblings for several years." *Id.* Otherwise, Defendant reported "an
. . . uneventful childhood and advised he did not experience any physical, emotional, or sexual
abuse during his childhood." *Id.*

Records from Immigration and Customs Enforcement corroborate Defendant entering the
United States on July 3, 1991. *Id.* ¶ 51. "From 2012 to 2014, [Defendant] alternated between
living in Atlanta, Georgia, and Queens, New York." *Id.* ¶ 50. Defendant resided in Queens from
2014 to 2016, and then moved to West Palm Beach Florida. *See id.* "Since 2017, [he] has
resided either with his mother . . . or with Ms. [Shedeira] Graham[,]" his romantic partner at the
time of the instant offense. *Id.* ¶¶ 39, 50.

Defendant's mother is reported to be sixty-eight years of age and resides in Queens, New
York, as a retired dietary nurse. *See id.* ¶ 40. "[She] is aware of his conviction for the instant
offense and remains supportive of [Defendant]." *Id.* Defendant and "his father maintained
minimal contact . . . and they had limited communication until [Defendant]'s teenage years." *Id.*
¶ 42. "[His] father died several years ago, in his mid-60s, from 'natural causes.'" *Id.* ¶ 40.

"[Defendant] has two maternal siblings." *Id.* ¶ 41. Shanette Marshall, who is forty-six
years of age, and Gregory Barnaby, who is forty-three years of age, both reside in Queens, New
York. *See id.* "Both siblings are aware of [Defendant]'s conviction for the instant offense and
remain . . . supportive of [him]." *Id.*

"From 1998 to the early 2000s, [Defendant] maintained a romantic relationship with
Simone Jarvais." *Id.* ¶ 43. Ms. Jarvais, who is forty-six years of age, resides in Atlanta, Georgia.
*See id.* The couple have one child, Mikel Jarvais, who is twenty-two years of age and resides in
Long Island, New York. *See id.*; *see also* Add. to PSR at 4, ECF No. 70 (citing Def.'s Sent'g

Mem. at 2, ECF No. 67). "[Defendant] reported sharing a good relationship with both Ms. Jarvais and Mikel." PSR ¶ 43.

"From 2000 to 2010, [Defendant] maintained a romantic relationship with Octavia Boyd[.]" *Id.* ¶ 44. Ms. Boyd, who is thirty-five years of age, resides in Atlanta, Georgia, and works for PepsiCo. *See id.* The couple have one child, Chase McKenzie, who is seventeen years of age and "resides with his mother[.]" *Id.*; *see also* Add. to PSR at 4 (citing Def.'s Sent'g Mem. at 2). "[Defendant] maintains a good coparenting relationship with Ms. Boyd and shares a good relationship with Chase." PSR ¶ 44.

"From 2013 to 2015, [Defendant] maintained a romantic relationship with Nunu Hooks[.]" *Id.* ¶ 45. Ms. Hooks, who is thirty years of age, resides in Queens, New York. *See id.* The couple have one child, Mulan Hooks, who is eleven years of age and "resides with her mother[.]" *Id.* "[Defendant] maintains a good coparenting relationship with Ms. Hooks and has a close relationship with Mulan." *Id.*

In 2015, Defendant married Tiffany Sicard. *Id.* ¶ 46. Mrs. Sicard is thirty-four years of age, resides in Queens, New York, and works "as a case manager for the Administration for Children's Services." *Id.* "The couple separated in 2017, due to infidelity in the relationship." *Id.* The couple have one child, Makayla McKenzie, who is eleven years of age and "resides with her mother[.]" *Id.* "[Defendant] maintains a good coparenting relationship with Mrs. Sicard and has a close relationship with Makayla." *Id.*

"Since 2017, [Defendant] has maintained a romantic relationship with Shedeira Graham." *Id.* ¶ 47. Ms. Graham is twenty-nine years of age, resides in Queens, New York, and works as "a customer service agent at a New York City-area airport." *Id.* Ms. Graham "described [Defendant] as family-oriented, genuine, caring, and hard-working." *Id.* ¶ 48. The couple have

one child, Orlando McKenzie, Jr., who is six years of age and "resides with his mother[.]" *Id.* ¶ 47; *see also* Add. to PSR at 4 (citing Def.'s Sent'g Mem. at 2). "[A]lthough she is unaware of the details of the case, [Ms. Graham] believes [Defendant] committed the offense to financially provide for his family." PSR ¶ 48.

Moreover, Ms. Graham stated "[Defendant]'s children all share a strong bond with him, and that [he] has always financially provided for his children[,]" "whom are reportedly all aware of his conviction for the instant offense and remain . . . supportive of him." *Id.* ¶¶ 48–49. "[Defendant] also noted that his younger children share close relationships with one another and spend time together[.]" *Id.* ¶ 49.

In addition to the above, the Court has considered the letter Defendant submitted on his own behalf, as well as observations of his childhood family life recounted in the mitigation report prepared by Ms. Lisa Orloff, LMSW, ACSW. *See* Def.'s Sent'g Mem., Ex. A, B.

  2.  *Educational and Employment History*

Defendant reports graduating from John Adams High Schol in Queens, New York, in 2002. PSR ¶ 60. "[H]e advised he was enrolled in special education classes due to difficulty with reading and comprehension." *Id.* Additionally, he states "[he] had poor attendance, average grades, and reported some school suspensions stemming from fights with other students." *Id.*

While incarcerated in 2012, *see infra* Part III(A)(3), "[Defendant] received training in installing floor coverings, as well as in barbering." *Id.* ¶ 61. "In 2013, [Defendant] reportedly obtained an occupational safety and health administration (OSHA) certificate and flagger certificate." *Id.*

9

Defendant's first records of employment were "[d]uring his teenage years" when "[he] performed landscaping jobs." *Id.* ¶ 65.

From 2001 to his arrest for the instant offense on December 7, 2023, Defendant reports "[he] was employed, as needed, in various odd jobs, including demolition, flagging, and construction laborer positions[.]" *Id.* ¶ 63. Defendant reported earning approximately $600.00 per week, but "did not recall the names of the businesses at which he worked[.]" *Id.*

After reviewing Defendant's financial position, the U.S. Probation Office ("Probation") concludes "he appears unable to pay a fine." *Id.* ¶ 69.

### 3.    *Prior Convictions*

Defendant has eight adult criminal convictions and two arrests prior to the instant case. *See* PSR ¶¶ 26–38. On October 7, 2002, the Queens County Supreme Court convicted Defendant of attempted robbery in the second degree, a Class D felony. *See id.* ¶ 26. Defendant was sentenced to five years of probation and an order of protection was issued. *See id.* On December 12, 2002, Defendant's probation was revoked following a new conviction. *See id.*

On October 9, 2002, Defendant was arrested after "[he] pushed, shoved, and punched a victim, breaking the victim's jaw and causing lacerations and bruises." *Id.* ¶ 27. The Queens County Criminal Court convicted Defendant of assault in the second degree, a Class D felony. *See id.* Defendant was sentenced to one year of custody and issued an order of protection on December 12, 2002. *See id.*

On July 28, 2003, Defendant was arrested after he and a co-conspirator "entered a house located . . . in Queens, New York, to use the bathroom[,]" and subsequently "broke into a safe under the bed and removed $1,400[.00] and jewelry . . . from the victim's home." *Id.* ¶ 28. The Queens County Supreme Court convicted Defendant of attempted burglary in the second degree,

a Class D felony. *See id.* Defendant was sentenced to two years of custody and eighteen months of post-release supervision on September 15, 2005. *See id.* On November 10, 2005, Defendant was paroled, but his parole was ultimately revoked on November 28, 2007, due to a violation. *See id.*

On March 10, 2004, Defendant was arrested after he "went through [a] victim's pockets" in search of U.S. currency the victim refused to give Defendant, "followed the victim out of the store and punched the victim with a closed fist." *Id.* ¶ 29. The Queens County Supreme Court convicted Defendant of attempted robbery in the third degree, a Class E felony. *See id.* Defendant was sentenced to one year of custody on September 15, 2005. *See id.*

On January 13, 2006, Defendant was arrested when "[he] was found in possession of a .22 caliber pistol, which was loaded with one round of ammunition." *Id.* ¶ 30. The Queens County Supreme Court convicted Defendant of attempted criminal possession of a weapon in the third degree, a Class E felony. *See id.* Defendant was sentenced to eighteen months to three years of custody on November 13, 2007. *See id.* On February 14, 2008, Defendant was paroled and subsequently discharged from parole on August 27, 2009. *See id.*

On February 21, 2006, Defendant was arrested after "[he] drove a motor vehicle through several red lights and drove on a public sidewalk causing pedestrians to jump out of the way of the vehicle." *Id.* ¶ 31. The Queens County Criminal Court convicted Defendant of reckless endangerment in the second degree, a misdemeanor. *See id.* Defendant was sentenced to one year of custody on January 26, 2007. *See id.*

On April 25, 2008, Defendant was arrested after sexually assaulting a victim whom he "grabbed . . . by the hair and pulled . . . into a vehicle." *Id.* ¶ 32. The Queens County Supreme Court convicted Defendant of assault in the second degree, a Class D felony. *See id.* Defendant

11

was sentenced to five years of custody, five years of post-release supervision, and issued an order of protection on November 2, 2009. *See id.* On July 31, 2012, Defendant was paroled, but his parole was revoked May 20, 2016, due to a violation. *See id.* On September 27, 2016, Defendant was re-paroled and subsequently discharged from parole on April 20, 2018. *See id.*

On April 23, 2016, Defendant was arrested by the Boynton Beach Police Department for being an out-of-state fugitive. *See id.* ¶ 37. Further records regarding the disposition of this arrest were not provided to the Court. *See id.*

On September 23, 2020, Defendant was arrested following "a traffic stop" initiated after officers from the Greenville County Sheriff's Office of South Carolina observed Defendant was "traveling dangerously close to the vehicle in front of [him] and traveling in excess of the posted 60 mile per hour speed limit." *Id.* ¶ 33. "[A] vehicle records search revealed that the Pennsylvania license plate on the vehicle was listed on [the National Crime Information Center] as stolen." *Id.* The Greenville County 13th Judicial Circuit convicted Defendant of receiving stolen goods, a misdemeanor. *See id.* Defendant was issued a $500.00 fine, which Probation reports is presently unpaid. *See id.*

On December 2, 2021, Defendant was arrested following the search of his vehicle which "was double-parked in the roadway and had a possible fraudulent out-of-state license plate." *Id.* ¶ 38. "During an inventory search of the vehicle"—after Defendant was detained because "[he] could not provide valid identification of proof of ownership[,]"—"a loaded firearm was recovered." *Id.* "[T]he firearm was reported stolen out of Richmond City Police Department." *Id.* The Queens County Supreme Court charged Defendant with two counts of criminal possession of a weapon in the second degree, one count of criminal possession of a weapon in the fourth degree, one count of operation of an unregistered vehicle, and one count of motor

12

vehicle license violation. *See id.* Further records regarding the disposition of this charge were not provided. *See id.*

In addition to the above, the Court has considered the work performance rating completed by Correctional Counselor S. Patterson, and the certificates of completed services while Defendant has been incarcerated. *See* Def.'s Sent'g Mem., Ex. C.

### 4.    *Physical and Mental Health*

Defendant reports "he has no current physical health conditions." *Id.* ¶ 54. However, he did "suffer[] a gunshot wound in 2022, which has affected the mobility in [his] right hand." *Id.* ¶ 55. Moreover, Defendant states he has "no history of mental or emotional health conditions," and never experienced any suicidal ideations. *Id.* ¶ 56.

In addition to the above, the Court has considered the mitigation report prepared by Ms. Orloff, which addresses Defendant's self-reported intellectual and emotional disabilities, among other details. *See* Def.'s Sent'g Mem., Ex. B.

### 5.    *Substance Abuse*

Defendant began using marijuana "in his early teenage years[.]" PSR ¶ 57. "[U]ntil his arrest for the instant offense, [he] smoked up to 1/8 of an ounce of marijuana daily." *Id.*

Defendant reports "complet[ing] an outpatient substance abuse treatment program" for "three days per week for several months" "while on parole supervision" in 2015. *Id.* ¶ 58. Additionally, "he completed a 28-day inpatient substance abuse treatment program at Cornerstone of Medical Arts Center in Fresh Meadows, New York." *Id.*

Otherwise, "[Defendant] denied any other history of illicit substance use and reported only occasional alcohol consumption." *Id.* ¶ 59.

13

6. *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

**B.  The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. "Sex trafficking, and particularly the sex trafficking of minors, is a horrendous crime that strips victims of their dignity and self-worth, causing them unimaginable damage[.]"  Gov't Sent'g Mem. at 5–6, ECF No. 69.  Defendant's criminal acts "are not the circumstances of a single bad decision; they reflect a sustained, deliberate course of conduct in which [he] treated women and a minor girl as commodities to be transported, marketed, sexually exploited, and sold for his profit."  *Id.* at 5.

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor.  18 U.S.C. § 3553(a)(2).

14

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant.  18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(2).  Plea ¶ 1.  Defendant faces a maximum term of life incarceration and a minimum term of ten years' incarceration.  18 U.S.C. § 1591(b)(2).

Defendant also faces a maximum term of life supervised release and a minimum term of five years' supervised release.  18 U.S.C. §§ 1591(b)(2), 3583(k).  If a condition of supervised release is violated, Defendant may be sentenced to up to life incarceration without credit for pre-release incarceration or time previously served on post-release supervision.  18 U.S.C. § 3583(e)(3).  If Defendant commits any criminal offense under Chapter 109A, 110 or 117, or 18 U.S.C. §§ 1201 or 1591, for which incarceration for a term longer than one year can be imposed, Defendant shall be sentenced to not less than five years and up to the maximum term of incarceration for the offense.  18 U.S.C. § 3583(k).

In addition to facing terms of incarceration and supervised release, Defendant faces a maximum fine of $250,000.00.  18 U.S.C. § 3571(b).  Defendant is ineligible for probation.  18 U.S.C. §§ 1591(b)(2), 3561(a)(1), (3).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  18 U.S.C. § 3553(a)(4)(A).

15

Pursuant to the Guidelines, the Government and Defendant stipulated to a Total Adjusted Offense Level of 35 in the Plea.[3] *See* Plea ¶ 2.

The applicable Guidelines provision is § 2G1.3, which covers, *inter alia*, forms of sexual conduct involving a minor. *See* U.S.S.G. § 2G1.3. Here, the Base Offense Level for a conviction pursuant to 18 U.S.C. § 1591(b)(2) is 30. U.S.S.G. § 2G1.3(a)(2); PSR ¶ 14; Gov't Sent'g Mem. at 3.

Probation and the Government agree certain adjustments apply to Defendant. First, the Probation and the Government agree U.S.S.G § 2G1.3(b)(2)(B) adds 2 levels because Defendant "unduly influenced a minor to engage in prohibited sexual conduct[.]" U.S.S.G § 2G1.3(b)(2)(B); PSR ¶ 15; Gov't Sent'g Mem. at 3.

Second, Probation and the Government agree U.S.S.G. § 2G1.3(b)(3)(B) adds 2 levels because "[Defendant] used a computer or an interactive computer service to offer and solicit a person to engage in sexual contact with a minor." PSR ¶ 16 (citing U.S.S.G. § 2G1.3(b)(3)(B)); Gov't Sent'g Mem. at 3.

Third, Probation and the Government agree U.S.S.G. § 2G1.3(b)(4)(A) adds 2 levels because "the offense involved the commission of a sex act or sexual contact[.]" U.S.S.G. § 2G1.3(b)(4)(A); Add. to PSR at 2; Gov't Sent'g Mem. at 3–4; Plea ¶ 2.

Finally, Probation and the Government agree U.S.S.G. § 3A1.1(b)(1) adds 2 levels because Jane Doe #2 qualifies as a vulnerable victim given "[she] was trafficked by [Defendant] . . . after she had run away from home and from [the ACS]." Gov't Sent'g Mem. at 4; Add. to PSR at 2; U.S.S.G. § 3A1.1(b)(1); Plea ¶ 2.

---

[3] The parties initially calculated a Subtotal Adjusted Offense Level of 38. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 35 because the Subtotal Adjusted Offense Level was subject to a two-level reduction "[i]f [Defendant] clearly demonstrate[d] acceptance of responsibility," and a one-level reduction "if [Defendant] . . . ple[d] guilty on or before May 15, 2025[.]" *Id.*

16

Defendant does not address these enhancements in his sentencing materials. Def.'s Sent'g Mem.

The parties also agree certain mitigation factors should apply to Defendant pursuant to the Guidelines. Probation and the Government agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). U.S.S.G. § 3E1.1(a)–(b); PSR ¶¶ 21–22; Gov't Sent'g Mem. at 3. Defendant did not provide a Guidelines calculation but "[he] accepts full responsibility for his actions." Def.'s Sent'g Mem. at 12.

In the Plea, the Government and Defendant assumed Defendant fell within Criminal History Category II. *See* Plea ¶ 2. However, Probation and the Government agree Defendant's Criminal History Category is III due to his prior adult criminal convictions. U.S.S.G. §§ 4A1.1(a), (c), 4A1.2(e)(1)–(2), (k); PSR ¶¶ 25–34; Gov't Sent'g Mem. at 4. Six of Defendant's convictions are not counted for purposes of computing criminal history because (1) two prior sentences—which exceeded one year and one month—were not imposed within fifteen years of Defendant's commencement of the instant offense, and (2) four prior sentences were not imposed within ten years of Defendant's commencement of the instant offense. U.S.S.G. § 4A1.2(e)(3); PSR ¶¶ 26–31. Defendant does not address which Criminal History Category he falls within but acknowledges the discrepancy between the Plea and PSR. *See* Def.'s Sent'g Mem at 3.

Probation and the Government agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 35 and a Criminal History of III results in a Guidelines range of 210 to 262 months' incarceration. Add. to PSR at 3; Gov't Sent'g Mem. at 4; U.S.S.G. § 5A. This Guidelines range is subject to a ten-year statutory minimum and maximum term of life under 18 U.S.C. § 1591(b)(2).

17

Defendant did not provide a Guidelines range but highlights "the [G]overnment agreed not to oppose [his] request that a sentencing range of 151 to 188 months' imprisonment is appropriate[.]" Def.'s Sent'g Mem. at 3 (citing Plea ¶ 5(b)).

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any applicable policy statements. Finding none of its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Defendant believes a sentence of 151 months' incarceration is sufficient punishment as compared to similarly situated defendants. In support of his below-Guidelines recommendation, Defendant cites a case before this Court. Def.'s Sent'g Mem. at 8 (citing *United States v. Dixon*, 23-CR-90, 2025 WL 3442994 (E.D.N.Y. Nov. 24, 2025) (Kuntz, J.)). In *Dixon*, the defendant had the same applicable Guidelines range (as calculated by Probation and the Government)—210 to 262 months' incarceration—as a result of being convicted for "sex trafficking of a minor" and "a firearms offense[.]" *Id.* at 9. However, this Court sentenced the defendant to the below-Guidelines sentence of "180 months in prison." *Id.* at 8. Additionally, Defendant references *United States v. Jones*, where "[District] Judge Irizarry sentenced the defendant to 151 months

18

for pimping a seventeen- and an eleven-year-old," *id.* at 9 (citing 07-CR-866, 2013 WL 937878 (E.D.N.Y. Mar. 11, 2013) (Irizarry, J.)), and *United States v. Mason*, where "the defendant sex trafficked a child for three years, in addition to running an adult prostitution business and selling drugs; he was sentenced to 156 months." *Id.* (citing 18-CR-461 (DeArcy Hall, J.), *see* ECF No. 17).

For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the fully amount of each victim's losses as determined by the Court" and consistent with 18 U.S.C. §§ 3663A and 3664 Plea ¶ 1(e). As previously mentioned, "[Defendant] agree[d] and stipulate[d] that for the purposes of restitution . . . both Jane Does #1 and 2 [would] be entitled to claim restitution." *See supra* Part I(B)(2) (citing Plea ¶ 1(e) n.1). "Affidavits of loss were mailed to the victims by the Government[,]" but no responses were received as of the time Probation disclosed the PSR. PSR ¶ 10.

As of the time of sentencing, no responses have been received regarding victim losses. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety (90) days after this sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

## IV.    Conclusion

And finally, the Court has this to say. Thirty years ago, the iconic musical "Rent" opened on Broadway. It began its second act with the now legendary song "Seasons of Love," also known as "525,600 Minutes." Jonathan Larson wrote and composed the song which poses the question we face today: What is the proper way to value a year in human life?

> Five-hundred-twenty-five-thousand-six-hundred minutes.
> Five-hundred-twenty-five-thousand moments so dear.
> Five-hundred-twenty-five-thousand-six-hundred minutes;
> How do you measure, measure a year?
>
> In daylights, in sunsets, in midnights, in cups of coffee.
> In inches, in miles, in laughter, in strife.
> In five-hundred-twenty-five-thousand-six-hundred minutes;
> How do you measure a year in the life?
>
> How about love?
> How about love?
> How about love?
> Measure in love.
> Seasons of love.
>
> . . .
>
> In truths that she learned, or in times that he cried
> In bridges he burned, or the way that she died
>
> It's time now to sing out
> Though the store never ends
> Let's celebrate, remember a year
> In the life of friends

Defendant devoted his life, his energy, and his power over women and girls to inflict pain, suffering, sexual abuse, and violence with beating and deployment of firearms. His seasons of love were one continuous violation of the law, decency, and kindness. How about love? How about measured in seasons of love?

20

His recidivism, his lack of remorse, and his use of the word "I" more than thirty times in his one-page letter to this Court tell you all you need to know. His season of love has involved nothing more than abuse in pursuit of selfish love of himself. It ends today.

For the reasons set forth above, the Court sentences Defendant to 188 months' incarceration; five (5) years of supervised release with both the standard and special conditions of supervision; mandatory restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the forthcoming Order of Forfeiture; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: July 8, 2026
       Brooklyn, New York

21